# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DAVID THOMPSON,

        *Plaintiff*,

   v.

JEFFERSON B. SESSIONS, III, Attorney
General of the United States,

        *Defendant.*

Civil Action No. 16-3 (RDM)

## AMENDED MEMORANDUM OPINION AND ORDER

Plaintiff David Thompson, proceeding *pro se*, brings this action against his former employer, the U.S. Department of Justice, for alleged violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 633a *et seq.*, the Due Process Clause of the Fifth Amendment, and the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. Thompson claims that the Department unlawfully discriminated against him on the basis of his sex and age by, among other things, investigating him, reprimanding him, and, ultimately, constructively discharging him for what he characterizes as his use of profanity in the workplace. *See* Dkt. 7 at 1, 3–5, 7 (Am. Compl. ¶¶ 1, 7–12, 16). He also claims that the Department violated his rights under the Due Process Clause of the Fifth Amendment by conducting a "biased and unfair" investigation and grievance process. *Id.* at 7 (Am. Compl. ¶ 18). Finally, he claims that the Department maintains a policy and practice of not responding to FOIA requests in a timely manner. *Id.* at 7 (Am. Compl. ¶ 18).

The parties' cross-motions for summary judgment are now before the Court. Dkt. 18; Dkt. 19; Dkt. 20. The Department, for its part, contends that Thompson was disciplined for a

legitimate, non-discriminatory reason—his abusive and inappropriate treatment of his colleagues—and that there is no evidence from which a reasonable jury could find that this reason was pretextual. Thompson disagrees and argues that the undisputed evidence shows that the Department did *not* discipline a similarly situated younger female employee who also used profane language in the workplace. The parties also dispute whether the Due Process Clause provides a remedy for any alleged bias or unfairness in the Department's investigation of Thompson's conduct or in its adjudication of his grievance. Finally, the parties disagree about the substance and merit of Thompson's FOIA claim.

As explained below, the Court first concludes that Thompson has failed to identify evidence from which a reasonable jury could find in his favor on his Title VII and ADEA claims. Accordingly, the Court will grant the Department's motion for summary judgment on these claims. Second, the Court concludes that Thompson lacks standing to pursue his due process claim and will therefore dismiss that claim. Third, the Court concludes that the existing record is insufficient to permit the Court to determine whether Thompson has standing to pursue his FOIA "policy and practice" claim and will allow Thompson to submit further evidence on this point. The Court will, therefore, deny the Department's motion for summary judgment on this claim and will deny Thompson's motion for summary judgment in full.

## I. BACKGROUND

Because this decision ultimately concludes that the Department is entitled to summary judgment on Thompson's Title VII and ADEA claims, the Court must review the facts relevant to those claims in the light most favorable to Thompson. *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

At the time of the relevant events, Thompson was sixty years old and worked as a senior trial lawyer at the Department of Justice in the Environmental Defense Section ("EDS") of the Environment and Natural Resources Division ("ENRD").  Dkt. 20-2 at 3 (Thompson Aff. 2). Thompson joined EDS in 1989 and worked in that office until his retirement in 2008.  Dkt. 19-2 at 63 (Grishaw Dep. 15:3); Dkt. 20-2 at 3, 6 (Thompson Aff. 2, 5); Dkt. 20-27 at 2.  During his tenure with the Department, Thompson received numerous merit-based "special achievement awards," Dkt. 20-2 at 8 (Thompson Aff. 7), and "he consistently received performance appraisals at the highest available rating," Dkt. 20 at 4.  For Thompson's last five years at the Department, he "exclusively or nearly exclusively" represented the United States in enforcement actions brought under CERCLA.  Dkt. 20-2 at 4 (Thompson Aff. 3).

A.      **April 2: Email Incident**

In the fall of 2007, Thompson's first-level supervisor, EDS Assistant Chief Mary Edgar, asked him to take over as "lead counsel" in the "*Raytheon* case," which was set to go to trial in April 2008.  Dkt. 20-4 at 2–3 (Thompson Grievance); Dkt. 20-2 at 9–10 (Thompson Aff. 8–9). Thompson asserts that, when he took over the team, the "case was in disarray," requiring "50, 60, and 70 hour [work-]weeks."  Dkt. 20-4 at 2.  He further asserts that, while working on this case, he "was necessarily aggressive not only with the other side but also with [the Department's own] lawyers."  *Id.*  As the trial date approached, Thompson frequently worked from home "to avoid voicemail, [e]mail, [and] people coming into [his] office" while he was preparing.  Dkt. 20-2 at 9 (Thompson Aff. 8).  Moreover, because he did not "bother to get a Blackberry" or another Department-issued device capable of connecting to the Department's electronic networks, Thompson did not "have access to office [e]mails or . . . files remotely from [his] home," Dkt. 20-3 at 3–4 (Thompson Dep. 24:5–7, 25:1–2).

On April 2, 2008, Thompson was preparing for trial at home when he realized that he needed to access an email from an expert witness. Dkt. 20-3 at 36 (Thompson Dep. 55:10–25). He had been up all night working on the case and was "dog-tired." *Id.* (Thompson Dep. 55:14). Rather than "driving . . . [forty-five] minutes to an hour into work . . . to download one [e]mail," Thompson left a voicemail for Mary Whittle, another attorney at EDS and his "number two chair on the [*Raytheon*] case," asking her to retrieve the email from his office computer. Dkt. 20-2 at 10 (Thompson Aff. 9). Around noon, Thompson reached Whittle by telephone and, again, asked her to go to his office to access the email for him. Dkt. 20-3 at 37 (Thompson Dep. 56:3–7). When Whittle repeatedly refused to do so, "[Thompson] said, 'F*** you,' and [he] hung up the phone." *Id.* (Thompson Dep. 56:17–19); *see also* Dkt. 20-2 at 11 (Thompson Aff. 10); Dkt. 20-19 at 3 ("Three times I asked her to perform a simple trial preparation task, and three times she refused without explanation. THAT is when I finally lost my temper.")

Immediately after her call with Thompson, Whittle sent the following email to Edgar and Cherie Rogers, another EDS Assistant Chief:

> Dave just yelled at me for not logging onto his computer and pulling the emails from [the expert witness]. He screamed "F*** you!" at the top of his lungs and hung up.
>
> I want to be clear. If he does this again, I am not going to trial with him. If we are in trial, I am coming home. He has now threatened to hit me, said all kinds of inappropriate sexual things in front of me, screamed at me, blamed me, cursed at me, etc. I am a grown woman and a good lawyer, and this abuse is unacceptable.

Dkt. 20-5 at 2. Rogers forwarded Whittle's email to Letitia Grishaw, the EDS Section Chief and Thompson's second-line supervisor, and, the next morning, Edgar and Grishaw met with Whittle to discuss the incident. Dkt. 20-5 at 3; Dkt. 20-6 at 2.

During that April 3 meeting, Whittle stated that, over the previous few months, Thompson "repeatedly yelled at her angrily" using "obscenities and curses." Dkt. 20-6 at 2. She further explained that these incidents occurred "when the two of them were discussing legal or strategic aspects of the case and she ventured to disagree with him," *id.*, and when she refused "to perform tasks that [Thompson] should have done himself or [should have] requested [that] an LSA or paralegal" perform. *Id.* at 3. "Feeling intimidated by the repeated outbursts, [Whittle] found herself avoiding disagreements with [Thompson], and then [having Thompson] yell[] at her for not speaking up when he was wrong." *Id.* Whittle "recited another instance in which [Thompson] was yelling at her, and she felt her heart beating, and felt short of breath, and when she took a deep breath, [Thompson] yelled at her for 'sighing' about what he [had] said, apparently taking it as an indication of her disrespect for him." *Id.*

In addition to the April 2 incident, Whittle described a number of instances in which she believed Thompson had behaved "inappropriate[ly]." *Id.* For example, she told Edgar and Grishaw that Thompson "frequently called her a 'b****;'" that he described another female colleague as able to, in his words, "ruin a good wet dream;" that he "told her that he was suffering from a 'bleeding d***'" (he later explained that she had repeatedly asked him about a personal medical condition); that he had, in a "jok[ing]" manner, "leaned in toward her" after she had "made a somewhat flip remark" and "punched one fist into the palm of his other hand" (he later described this as a reference to Jackie Gleason); and that, after a male "member of the trial team" asked Thompson "if there was anything else he could do to help him," Thompson responded "by saying, 'Yeah, wipe my a**.'" *Id.* at 3–4. Whittle told her supervisors that "she had never felt that [Thompson] was making any sexual overture[s] to her," but that "she had

grown tired of the locker-room conversation," and she expressed her fear that there would be "further scenes" if she went "on the road" to trial with Thompson. *Id.*

Later that same day, Grishaw asked Thompson to come to her office for a meeting. Dkt. 20-2 at 12 (Thompson Aff. 11). Although Thompson "had no prior notice of what the meeting was going to be about," he "assumed" it could concern his call with "Whittle . . . the previous day." *Id.* at 12–13 (Thompson Aff. 11–12). When he arrived, Grishaw, Edgar, and ENRD Executive Officer Robert Bruffy described the "charges" Whittle had made and asked him to respond. *Id.* Although Thompson disputes some of Whittle's charges, *id.*, he (1) "acknowledged [at the meeting] that he had yelled at [Whittle] on the phone," Dkt. 20-6 at 4; (2) admitted that he had "told her to 'f*** off'" in response to what he considered "her insubordination in refusing to log onto his computer and pull off the emails in question," *id.*; and (3) confirmed that he had made many of the other statements Whittle had attributed to him.[1] Thompson further acknowledged that "he yell[ed] at people when, in his view, they deserve[d] it," and he explained that he was "too old to change." *Id.* He explained that he made "crude and blunt" comments "'all the time'" and that he "d[id not] see anything wrong with" that, nor did he see anything wrong in "asking [Whittle] to see that clerical tasks were carried out for him." *Id.*; *see also* Dkt. 20-3 at 23 (Thompson Dep. 165:14–166:4) (explaining that he did not think his statements were "inappropriate at all" and noting that he did not find it "inappropriate" that he failed to apologize to Whittle). After the meeting, Bruffy contacted EDS's sexual harassment coordinator, Andrea

---

[1] *See, e.g.*, Dkt. 20-3 at 35–37 (Thompson Dep. 54:12–56:19) (admitting that he had made the "bleeding d***," "ruin a [good] wet dream," "wipe my a**," and "f*** you" comments); Dkt. 20-2 at 13 (Thompson Aff. 12) (explaining that, during the meeting, he "admitted" that he "use[d] profanity in [Whittle's] presence" but denied that he had ever "called her a b****" or "sexually harassed her"); Dkt. 20-7 at 2 (Bruffy Decl. ¶ 7) ("[Thompson] confirmed having made all of the comments alleged by Ms. Whittle."); Dkt. 20-26 at 2 (Edgar Decl. ¶ 5) (same).

Berlowe and requested that she "conduct an internal investigation into the allegations" to determine if Thompson's behavior had created a "potential hostile work environment" or if it raised any other "potential sexual harassment issues."  Dkt. 20-7 at 2 (Bruffy Decl. ¶ 10); *see also* Dkt. 20-26 at 3 (Edgar Decl. ¶ 7) ("[T]he [Department] initiated an investigation to ensure that, if found appropriate, it could take prompt corrective action with regard to [Thompson's] comments and conduct.").

### B.      April 4–September 3: Thompson on Sick Leave

Several hours after the April 3 meetings, Thompson sent Grishaw and Edgar an email resigning his position.  Dkt. 20-8 at 2.  He explained that he was "under great stress because of upcoming back-to-back-to-back trials," which, in conjunction with his "heart condition" and recent hospitalizations, had "become far too much over the past few months."  *Id.*  Thompson also noted that he felt "outrage[d]" and "betray[ed]" by Whittle's "claims against [him]," and he expressed "shock" that her charges were "being given the slightest attention," especially because, he asserted, Whittle had "publicly referred to a co-worker . . . with a name much more vile than [he] ha[d] ever used."  *Id.*  He concluded by noting that, "[i]n light" of his age, health, and stress concerns, he "th[ought] it best" to "resign, eff[ec]tive immediately."  *Id.*  Upon receiving Thompson's email, Grishaw emailed and called Thompson to notify him that she was "not accepting his resignation on the spot."  Dkt. 20-9 at 2.

Rather than formalizing his resignation, Thompson informed his supervisors that he planned to take "sick leave for several weeks."  Dkt. 20-7 at 3 (Bruffy Decl. ¶ 14); *see also* Dkt. 20-2 at 13 (Thompson Aff. 12).  Thompson emailed Edgar, Grishaw, and Rogers to let them know that he would submit a note from his doctor to justify his sick leave and that it was his "present plan" to "[r]etire at some point in May."  Dkt. 20-10 at 2.  On April 11, Thompson submitted a note from his doctor stating that, "due to stress," he was "restricted from work . . .

for a period of not less than [eight] weeks," Dkt. 20-11 at 2, and, on April 28, he submitted a

second note that "restricted" him "from work until further notice," *id.* at 3.  Over the next several

months, the Department attempted to confirm Thompson's retirement date, but Thompson

repeatedly indicated that he had not yet "determined exactly when" he would retire.  Dkt. 19-1 at

118; *see also, e.g.*, *id.* at 111, 116–19, 123, 125, 129.

While Thompson was out on leave, three attorneys were scheduled to begin work at EDS,

and, because the EDS was "tight on office space," Grishaw was having difficulty locating

"places to put them."  Dkt. 20-12 at 7 (Grishaw Dep. 136:12–14).  "Under the impression that

[Thompson] w[as] retiring," she called him on June 30 to ask if EDS "could use [his] office" to

house one of the new recruits.  *Id.* (Grishaw Dep. 136:15–18).  Thompson asserts that Grishaw

"threatened . . . to evict [him] from [his] office," Dkt. 20-4 at 4, but, as Grishaw testified,

because Thompson "objected" to her plan, "it didn't happen," Dkt. 20-12 at 8 (Grishaw Dep.

137:7–9).  During that same telephone conversation, Grishaw "encouraged [Thompson] to

retire," but he "declined to commit to a retirement date."  Dkt. 20-4 at 4.  Later that same day,

under the impression that Thompson was "plan[ning] on allowing EDS to use [his] window[ed]

office," Rogers emailed Thompson to see if he was willing to "release [his] office" immediately

so that a new attorney could be housed there.  Dkt. 20-13 at 2.  Rogers noted in her email,

however, that it was "totally [Thompson's] decision" and that he could "decide . . . to leave

things as is."  *Id.*  Thompson, in turn, responded that he had not yet "decided what [he was]

going to do," explained that he would "prefer to clean [his] office [him]self," and asked Rogers

to "hold off on doing anything."  *Id.*

At around the same time, Bruffy grew concerned that there was a "fairly good"

"possibility of a hiring freeze" at the Department.  Dkt. 20-15 at 4 (Bruffy Dep. 55:16–18).  He

communicated that concern to Grishaw, informing her that it "would behoove [her] to make sure that any existing vacancies . . . were filled" before a freeze went into effect. Dkt. 20-14 at 5. On July 15, Grishaw called Thompson to inform him of the impending freeze and explained that she could not "hire for [his] position until [he] told [her] definitely" that he was retiring. Dkt. 19-2 at 318. She noted that she was "not trying to pressure [him] to make a decision one way or another," but that she understood it was his "plan" to retire and "formaliz[ing] that decision" for "a date in the future" would "allow [her]" to "backfill the position." *Id.* Two days later, Thompson sent an email to Edgar and Rogers noting that he "ha[d] received several calls from [Grishaw] about his retirement," but, because he was handling a number of "family [and] health problems," "retirement [wa]s not exactly the number one target on [his] radar." Dkt. 19-2 at 319. He also stated that "[he] [was] on extended sick leave for a reason." *Id.*

## C.     Spring–Summer: The Department's Investigation

While this back-and-forth was occurring, the investigation into the April 2 incident proceeded as well. Dkt. 20-7 at 3 (Bruffy Decl. ¶ 15). On April 22, Bruffy contacted Andrea Berlowe, an ENRD investigator, to inform her that the investigation "should start . . . , if only to keep the pressure on for [Thompson] to leave." Dkt. 19-2 at 301. Approximately a month later, Thompson "received written notice of the charges against [him]." Dkt. 20-4 at 4. Two days after that, Thompson emailed a lengthy statement to the investigators in which he "freely admit[ted] that [he] use[d] foul language" and acknowledged that he "lost [his] temper" with Whittle on April 2 when, "three times[,] she refused" to "perform a simple trial preparation task . . . without explanation." Dkt. 20-19 at 2–3. Thompson also noted, however, that he found it "silly" that Whittle would "portray herself as some sort of delicate innocent" when she had "publicly refer[red]" to a colleague as a "'c***.'" *Id.* at 2. And, he suggested that, if "ENRD want[ed] to 'investigate' people for foul language,' it should "do so on a non-discriminatory

basis and investigate females as well as males." *Id.* at 2. Thompson concluded by explaining that he was "upset that [Whittle's] charge [wa]s being given even the slightest attention," that he was "bitter" about the investigation, and that he was "happy about retiring." *Id.* at 3.

Thompson returned to these themes in an interview Berlowe conducted on May 22. He explained that he considered himself a "loud, profane, aggressive, and enthusiastic" person, and, although he admitted to calling Whittle a "b**** . . . once in a while" or "two or three times," he claimed to have done so "in a joking way." Dkt. 20-20 at 3, 5. He also noted that "everyone who successfully tries cases is profane," and, to illustrate the point, he referenced Whittle's "use[] [of] the C word to refer to [a colleague]." *Id.* at 3, 4. Thompson explained that "he did not witness" Whittle use the word, but that she told him that she had "gone 'down the hall calling [the other EDS lawyer] a "c" word' and someone had told . . . Whittle that she cannot say that." *Id*. at 5. Thompson also acknowledged that he had said that this same EDS lawyer "could f*** up a wet dream," and he acknowledged that he had made a "comment about a 'bleeding d***,'" but explained that he did so only after Whittle pressed him on why he needed to be out of the office for an entire day. *Id.* And, although explaining that he was joking, he acknowledged that he complimented another lawyer by saying, "'You've done all I asked you to do except wipe my a**.'" *Id.* at 5–6. Finally, he explained that he was "upset by the situation in which" he found himself because he had not threatened violence against anyone, had not called anyone a name, and had not acted dishonestly or unethically; rather, he felt that, after his meeting with his EDS supervisors, "the world ha[d] passed [him] by." *Id.* at 6.

The investigation into Thompson's actions was completed by late August or early September of 2008. Dkt. 20-7 at 3 (Bruffy Decl. ¶ 19). Berlowe concluded that "Thompson had not engaged in sexual harassment, but that he had, over a period of time, yelled at, and made

numerous condescending, rude[,] and inappropriate comments to other [EDS] attorneys." *Id.* at 3–4 (Bruffy Decl. ¶ 19).

### D.     September 4–15: Thompson's Brief Return to EDS and Subsequent Retirement

In late August, Thompson announced his intention to return to work. Dkt. 20-14 at 6 (Grishaw Interrog. ¶ 17). In response, Grishaw concluded that she needed to issue Thompson a reprimand "regarding his abusive behavior during his prior tenure in the office." *Id.* Grishaw noted that she "would not have needed to reprimand him regarding his behavior" if he had retired, but because he opted to "return[] to the office environment," she determined that she "needed to take that step so as to attempt to protect the other members of [EDS] from additional abusive interactions." *Id.*

To that end, Grishaw issued Thompson a formal letter of reprimand on September 8, 2008, Dkt. 20-25, four days after he returned to work, Dkt. 20-4 at 4. In her letter, Grishaw recounted Whittle's complaints and Thompson's responses, as described above. Dkt. 20-25. The letter went on to describe the findings of the investigation and Grishaw's conclusions. Because those statements constitute the clearest articulation of the Department's proffered non-discriminatory reason for taking disciplinary action against Thompson, the Court will quote that portion of the letter at length:

> [In the course of the investigation,] [e]leven individuals (including you) were interviewed. The investigation revealed that you have been disrespectful and/or have used inappropriate language with a number of attorneys and staff at the Environmental Defense Section. You have a continuing pattern of loud, profane and anger-laden tirades at colleagues, followed by a series of apologies. During you interview with the investigator, you admitted to yelling at co-workers and making comments of a sexual nature. You stated to the investigator, "I am loud, profane, aggressive, and enthusiastic (until now)." You told the investigator that everyone who successfully tries cases is profane, that you do not have time to suck up to people and be nice, and that you raise your voice in anger at times.
>
> When you were asked to address assertions regarding your behavior, your use of crude and sexual remarks, you attempted to justify your actions by stating that your

remarks were taken out of context, or that they were in the nature of a joke, or that the remarks were necessary and appropriate based on the senior position you hold in the office. . . . You went on to say that you were frustrated because you had been "interrogated" by Mary Edgar, Robert Bruffy, and me – a "kangaroo court" – regarding the allegations of . . . Whittle, a "whining novice."

I am deeply troubled that you do not acknowledge or understand that your behavior was unacceptable and disrespectful. Furthermore, while you seem to have some remorse for some of your outbursts, you have not acted on that remorse to change your behavior pattern. You evidence a complete lack of concern for the individuals on the receiving end of your outbursts and inappropriate comments. Moreover, your treatment of your colleagues is counterproductive, and it does not foster cooperation. As a result, I am issuing this letter of reprimand to you to impress upon you that your behavior is not acceptable and that it will not be tolerated in the future.

It is imperative that you change your behavior pattern in the office.

*Id*. at 3.

Grishaw's letter of reprimand also imposed a series of conditions on Thompson's future employment with the Department. Grishaw "direct[ed] [Thompson] to attend an [i]nterpersonal [c]ommunications course," mandated that he "adhere to a fixed work schedule" in order to facilitate "appropriate supervision during business hours," and, most significantly, "reliev[ed] [him] of all trial work" by reassigning him to a role as an "Attorney-Advisor." *Id.* at 3–4. Grishaw concluded by "warn[ing]" Thompson that "further misconduct" would subject him "to more severe disciplinary action, up to an including removal from federal service." *Id.* at 4.

Shortly after returning to the office, Thompson learned that, unlike several of his colleagues, he had not received non-monetary "special commendation" awards for his work on the *Raytheon* case and another matter. Dkt. 20-3 at 27-28 (Thompson Dep. 262:15–267:3). The next day, he received his first post-reprimand assignment from Edgar. Edgar "previously discussed" the assignment with Grishaw to "ensure that it did not conflict with the terms of the [r]eprimand," Dkt. 20-26 at 3 (Edgar Decl. ¶ 10), but she did not communicate that discussion to

Thompson, Dkt. 19-1 at 181–82.  When Thompson "received the assignment," however, he "reminded [Edgar] that he was prohibited from trial work."  Dkt. 20-26 at 3 (Edgar Decl. ¶ 11).  Edgar responded that she "was aware" of the prohibition, and she told Thompson "not to worry about it."  *Id.*; *see also* Dkt. 20-3 at 42 (Thompson Dep. 110:10–14) ("[W]hen I got the assignment on September 10th, I went to [Edgar] and I said, 'You do realize the letter of reprimand prohibits me from all trial work?'  She said, 'Don't worry about it[.]'").  But, because Edgar was "engaged in another task at that moment," she "was not able to discuss the matter more fully with him" at that time.  Dkt. 20-26 at 3 (Edgar Decl. ¶ 11).  Thompson never sought any further clarification from Edgar, *id.* (Edgar Decl. ¶ 11), nor did he attempt to follow-up regarding the assignment with Grishaw, Dkt. 20-3 at 43 (Thompson Dep. 111:1–9), or with Christopher Vaden, the deputy EDS chief, *id.* (Thompson Dep. 111:19–24).

Instead, on September 15, 2008, Thompson sent his supervisors an email announcing that he had decided "to file [his] retirement papers and [to] retire as of th[at] week."  Dkt. 20-27 at 2.  A "Notification of Personnel Action" confirming Thompson's retirement was authorized that same day.  Dkt. 20-28 at 2.

E.      **September 10–October 29: Grievance Proceedings**

On September 10, 2008, the same date he received his first assignment following the issuance of the reprimand letter, Thompson filed a grievance against Edgar, Grishaw, Bruffy, and Whittle.  Dkt. 20-4 at 2.  In that document, Thompson acknowledged that he "used foul language" on multiple occasions and admitted to using an "expletive" after he "lost [his] temper" with Whittle on April 2.  *Id.* at 3.  Because of his use of a "dirty word," Thompson asserted, he had been "slandered and libeled, denied due process, 'investigated' as if [he] were a common criminal, and slighted twice for special achievement recognition"—all for the "same alleged

offense (i.e., foul language)" that Whittle ("someone younger and of a different gender") allegedly committed without consequence. *Id.* at 4. He also alleged that he was "subjected to a hostile work environment and a concerted effort to try to blacken [his] name, apparently based on [his] age or [his] gender or both." *Id.* at 5. Thompson concluded by requesting "restoration of [his] lost sick leave, the awarding of special achievement recognition, and future compensation for loss in connection with early retirement." *Id.*

The Department initially responded to Thompson's grievance on September 23, 2008, Dkt. 19-1 at 275, and, because Thompson filed the grievance against his supervisors, Bruffy selected Eileen Sobeck, "the career deputy assistant attorney general not in the direct line of supervision for [EDS]," as "the grievance reviewer," *id.* at 279 (Bruffy Dep. 76:4–10). Although the grievance was also filed against Bruffy, he conceded that he nonetheless played a role in the preparation of Sobeck's decision by either "reviewing" or "editing" the draft. *Id.* at 289 (Bruffy Dep. 86:19–22). Thompson challenged Sobeck's selection on October 15, noting that it did not appear to comply with Department policy. Dkt. 20-30 at 2. Thompson further complained that, "in light of" of the facts that (1) his "grievance mention[ed] possible gender discrimination;" (2) "[t]hree of the four individuals named in [the] grievance [were] women;" and (3) "both of the individuals who performed an investigation . . . were women," the designation of "a woman . . . as the grievance official" seemed "a bit odd." *Id.* The Department responded the next week, explaining that Sobeck's selection conformed with the Department's "grievance procedures" and assuring Thompson that Sobeck would adjudicate his grievance "fairly . . . and without regard to [his] gender." Dkt. 19-1 at 282.

On October 29, Sobeck denied Thompson's grievance. Dkt. 20-29. Sobeck first explained that, "to the degree [Thompson] s[ought] relief based upon perceived discrimination,"

she could not "provide [him] any redress" and directed him to the Department's equal employment opportunity ("EEO") process. *Id.* at 2. Turning to his request for the restoration of "800 hours of sick leave," Sobeck noted that Thompson had "requested the sick leave," had filed documentation from doctors medically justifying that leave, and had "actually t[aken]" the leave. *Id.* Accordingly, she found no basis to restore the hours to Thompson. *Id.* She then denied his request to "receive two special achievement awards," concluding that the Department's grievance policy did not permit Thompson to challenge decisions relating to awards. *Id.* And, finally, Sobeck declined to compensate Thompson for any financial costs attendant to his early retirement. *Id.* at 2–3. She explained that he was "eligible for full retirement" and that there was "nothing in [his] file to indicate that [his] decision to retire was based on anything other than [his] decision." *Id.* at 3.

**F.  2015–2016: Thompson's FOIA Requests and the Department's Response**

Several years later, Thompson submitted a series of FOIA requests to the Department. *See* Dkt. 20-32 at 1 (Wardzinski Decl. ¶ 4) (noting that ENRD "received two FOIA requests" from Thompson in 2015); Dkt. 20-33 at 1–2 (Sim Decl. ¶ 3) (noting that the Justice Management Division "received three" FOIA requests from Thompson in 2015). The Department did not provide an initial response to his requests within the twenty days mandated by FOIA, *see* 5 U.S.C. § 552(a)(6)(A)(i), but eventually provided Thompson with a number of documents responsive to his requests, some of which it redacted under various FOIA exemptions. *See* Dkt. 20-32 at 2 (Wardzinski Decl. ¶¶ 6, 9); Dkt. 20-33 at 3–4 (Sim Decl. ¶¶ 7–10); *see also* Dkt. 20-33 at 12–13 (letter from the Justice Management Division responding to Thompson's 2015 FOIA requests in November 2016, ten months after the initiation of this action).

## II. LEGAL STANDARD

The moving party is entitled to summary judgment under Federal Rule of Civil Procedure 56 if he can "show[] that there is no genuine dispute as to any material fact and [that he] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility" of "identifying those portions" of the record that "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" if it could affect the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). The Court, moreover, must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor. *Talavera*, 638 F.3d at 308 (D.C. Cir. 2011).

If the moving party carries this initial burden, the burden then shifts to the nonmoving party to show that sufficient evidence exists for a reasonable jury to find in the nonmoving party's favor with respect to the "element[s] essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* (quoting *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). The nonmoving party's opposition, accordingly, must consist of more than unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324. That is, once the moving party carries its initial burden on summary judgment, the nonmoving party must provide evidence that would permit a reasonable jury to find in its favor. *See Laningham v. U.S. Navy*, 813 F.2d 1236, 1241

(D.C. Cir. 1987). If the nonmoving party's evidence is "merely colorable" or "not significantly probative," the Court should grant summary judgment. *Liberty Lobby*, 477 U.S. at 249–50.

## III.  ANALYSIS

### A.  Discrimination Claims

Thompson alleges that he was subjected to unlawful discrimination based on his sex and age, in violation of Title VII and the ADEA. To prevail on these claims, he must "establish[] two elements": (1) that he "suffered an adverse employment action;" and (2) that the Department took that action "because of" his sex or age. *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008); *see also Wilson v. Cox*, 753 F.3d 244, 247 (D.C. Cir. 2014) (noting that courts "generally apply the same approach in ADEA cases . . . as [they] do in Title VII cases"). In a case, like this one, where the plaintiff lacks direct evidence of discrimination, the burden shifting framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), provides that the plaintiff must first make out a prima facie case of discrimination and that the burden then shifts to the employer to offer a legitimate non-discriminatory reason for its action. *See, e.g.*, *Chappell-Johnson v. Powell*, 440 F.3d 484, 487 (D.C. Cir. 2006) ("The *McDonnell Douglas* framework applies to both Title VII and ADEA claims.").

Once an employer has proffered a legitimate non-discriminatory reason for its action, however, "the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Brady*, 520 F.3d at 494 (emphasis in original). At that point, the only question for the Court is "whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis." *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008). The Court "evaluate[s] this question 'in light of the total circumstances of the case,'

17

asking 'whether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff . . . or any contrary evidence that may be available to the employer.'" *Nurriddin v. Bolden*, 818 F.3d 751, 758–59 (D.C. Cir. 2016) (alteration in original) (quoting *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012)).

Thompson's allegations of sex and age discrimination fall into three categories: alleged discrimination in (1) the investigation, reprimand, and reassignment that followed from the April 2, 2008, incident; (2) the denial of certain non-monetary performance awards that he claims he earned; and (3) his constructive discharge. The Court considers each category in turn.

1.    *Investigation, Reprimand, and Reassignment*

Thompson does not dispute that he said "f*** you" to a colleague when she repeatedly refused his request to retrieve an email from his computer. Dkt. 20-2 at 11 (Thompson Aff. 10). He does not deny his use of "locker room language" in the workplace, Dkt. 19 at 9, or "that [he] use[s] foul language" to "convey th[e] message" that litigation "is combat," Dkt. 20-19 at 2. He "acknowledge[s] that he yells at people" when they "deserve it," Dkt. 20-6 at 4, and he asserts that he "doesn't see anything wrong" with his "crude and blunt" demeanor, *id.* Accordingly, there is little dispute that Thompson engaged in the behavior described in the Department's September 8, 2008, letter of reprimand. That, however, does not end the matter. Although conceding many of the underlying facts, Thompson maintains the Department's investigation and reprimand decision were infected by discriminatory animus and that he was ultimately forced to retire because of his sex and age.

Because the Department has proffered a legitimate, non-discriminatory reason for its actions—Thompson's "pattern of loud, profane[,] and anger-laden tirades at colleagues," Dkt. 20-25 at 3—the Court must determine "whether 'there is evidence [in the record] from which a reasonable jury could find that the [Department's] stated reason'" for investigating, reprimanding, and reassigning Thompson was "'pretext' and that the Department, in fact," took those actions "because of his [sex and] age." *Coats v. DeVos*, 232 F. Supp. 3d 81, 91 (D.D.C. 2017) (second alteration in original) (quoting *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013)); *see also Brady*, 520 F.3d at 494. In an effort to carry this burden, Thompson makes three arguments: (1) Whittle, a younger female, also used profanity in the workplace but was not disciplined, *see, e.g.*, Dkt. 19 at 24–25, 33–34; (2) Thompson had a lengthy record of exemplary performance that did not warrant the reassignment, *see, e.g.*, *id.* at 8, 23, 30; and (3) the Department's investigation, reprimand, and reassignment process did not comport with the law, *see, e.g.*, *id.* at 31, 37. For the reasons explained below, the Court is unpersuaded by these arguments.

a.  <u>Comparator Evidence</u>

The centerpiece of Thompson's argument is that a reasonable jury could find in his favor because, even though he and Whittle "had the same supervisors and the same performance standards," he was disciplined for using profanity and she was not. Dkt. 19 at 33. Specifically, he claims that Whittle repeatedly referred to another colleague as a "f*****g c***," *id.* at 10, and, indeed, had "gone 'down the hall calling [that colleague] a "c" word,'" prompting "someone" to tell her to stop. Dkt. 20-20 at 5. Yet, when he brought Whittle's use of profanity to his supervisors' attention and suggested that, "if an investigation were to proceed against him, management should conduct a parallel investigation of" her, his "requests were ignored." Dkt.

19 at 13. Thompson contends that he and Whittle, despite "both us[ing] 'locker room language,'" were treated unequally "in every relevant respect" and that the "most significant differences between the two were that . . . Whittle was female and younger than" him. *Id.* at 33–34 (internal quotation marks and alterations omitted).

Thompson is correct that "[a] plaintiff may support an inference that the employer's stated reasons [for its actions] were pretextual, and that the real reasons were prohibited discrimination[,] . . . by citing the employer's better treatment of similarly situated employees outside the plaintiff's protected group." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015); *accord Royall v. Nat'l Ass'n of Letter Carriers, AFL–CIO*, 548 F.3d 137, 145 (D.C. Cir. 2008) ("One way to discredit an employer's justification is to show that similarly situated employees of a different [gender or age] received more favorable treatment."). "For a plaintiff to prove that []he is similarly situated to another employee," however, he "must demonstrate that []he and the alleged similarly-situated employee 'were charged with offenses of comparable seriousness,' and 'that all of the relevant aspects of h[is] employment situation were nearly identical to those of the other employee.'" *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1115–16 (D.C. Cir. 2016) (quoting *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015)). "Factors that bear on whether someone is an appropriate comparator include the similarity of the plaintiff's and the putative comparator's jobs and job duties, whether they were disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses." *Burley*, 801 F.3d at 301. "Whether two employees are similarly situated ordinarily presents a question of fact for the jury," *George v. Leavitt*, 407 F.3d 405, 414–15 (D.C. Cir. 2005) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)), but "not inevitably so," *Coats*, 232 F. Supp. 3d at 93; rather, to avoid summary judgment, a plaintiff challenging a

disciplinary action must identify *some* evidence from which a reasonable jury could find that the offense he committed was of similar seriousness to that committed by the more favorably treated comparator, *see Wheeler*, 812 F.3d at 1115.

For a number of reasons, Thompson has failed to satisfy this modest burden. First, and most significantly, he misunderstands the basis for the Department's reprimand decision. Although much of his argument turns on the premise that he was reprimanded for using "locker room language," Dkt. 19 at 33, for uttering "expletives," *id.* at 8, or for the use of "profanity," *id*. at 13, that misstates what the September 8 letter says. Although profane language was an element of what the Department found, the reprimand letter stresses that Thompson used that language in the course of "anger-laden tirades" directed at his colleagues, that he "yell[ed]" at co-workers," that he took the position that there were times when it was appropriate to "raise your voice in anger" at a colleague, that he demonstrated "a complete lack of concern for the individual on the receiving end or [his] outbursts and inappropriate comments," and that his "treatment of [his] colleagues [was] counterproductive[ ] and it [did] not foster cooperation." Dkt. 20-25 at 3. On top of this, the reprimand also emphasized Thompson's insistence that he had done little wrong and that he saw no reason to change. The letter explained, for example, that Thompson attempted to justify his behavior by stating that his comments were "taken out of context," were merely intended as "a joke," or—worse yet—"were necessary and appropriate." *Id.* As Grishaw wrote, she was "deeply troubled that [Thompson did] not acknowledge or understand that [his] behavior was unacceptable and disrespectful" and that Thompson, even when remorseful about his conduct, had "not acted on that remorse to change [his] behavior pattern." *Id.*; *see also* Dkt. 20-6 at 4 (Thompson explained that "he is crude and blunt, and doesn't see anything wrong with it"); *id.* (Thompson "acknowledged that he yells at people

21

when, in his view, they deserve it," and "that's just how he is; that he's been doing it for years; that he's too old to change").[2]

Viewed in this light, no reasonable jury could find that the Department was aware of equally serious misconduct by Whittle but chose to ignore her misconduct while reprimanding Thompson. Accepting Thompson's allegations as true for present purposes, there remains a vast difference between the accusation that Whittle used vile language in referring to a colleague (who was not present) and a pattern of abusive, angry, profane and unrepentant conduct directed at multiple colleagues in manner that undermined cooperation.[3] *See*, *e.g.*, *Duggan v. Sisters of Charity Providence Hosps.*, 663 F. Supp. 2d 456, 468 (D.S.C. 2009) (rejecting comparator evidence because there was no evidence that purported comparators, unlike the plaintiff, had "used profanity or abusive language where patients or their families could hear it"). Perhaps indicative of this difference, moreover, there is no evidence that any other employee at the Department complained about Whittle's conduct or, more importantly, believed that it interfered with the ability of EDS to perform its mission. To be sure, Thompson did bring Whittle's statements to the attention of his supervisors—but he did so only as a defense: instead of objecting to her conduct, he merely argued that she should be disciplined *if he* was. *See* Dkt. 19-

_____

[2]  Even after receiving a reprimand from the Department and resigning his position, Thompson, during a deposition taken more than five years after the April 2 incident, admitted that he did not "believe that [his use of profanity] w[as] inappropriate," referring to it as "locker room language" that did not warrant an apology to Whittle or anyone else. Dkt. 20-3 at 23, 26 (Thompson Dep. 165–66, 253–54).

[3]  There is no evidence in the record that Whittle ever directly confronted a colleague using profanity in an angry conversation. *See* Dkt. 20-3 at 18–19 (Thompson Dep. 118:4–119:3) (explaining that he was "relatively certain that [Whittle's profanity] wasn't [made] directly to [her colleague's] face standing [five] feet apart" and admitting that he had no knowledge whether the other EDS lawyer ever learned of Whittle's use of profanity); Dkt. 24 at 7 ("[T]here is no evidence . . . that [the other EDS lawyer] knew about" Whittle's use of profanity.).

2 at 295 ("If [the Department] wants to 'investigate' people for foul language, then I suggest [the Department] do so on a non-discriminatory basis and investigate females as well as males."). This contrasts starkly with the circumstances EDS management faced when Whittle contacted her supervisors immediately after her April 2 confrontation with Thompson and indicated that she no longer felt comfortable "going to trial with [Thompson]" and that his "abuse [wa]s unacceptable." Dkt. 20-5 at 2. Finally, there is no evidence that Whittle's profane statements were part of "a continuing pattern" of abuse or that there was reason to believe, as was the case with Thompson, that she was unwilling to change. *But cf*. Dkt. 20-6 at 2 (noting that "it is generally known within EDS that [Thompson] has a temper, which he has unleashed on those he works with as the tension mounts leading up to trial").

This is not to say that it would have been unreasonable for EDS to have reprimanded Whittle as well. It is not the Court's role, however, to act as "a 'super-personnel department' that reexamines" the Department's decisions. *See Wheeler*, 812 F.3d at 1114 (citation omitted). Rather, "the only relevant inquiry" is whether Thompson has "produced sufficient evidence for a reasonable jury to conclude that the [Department's] asserted nondiscriminatory reason" for disciplining him "was not the actual reason, and that instead the [Department] was intentionally discriminating against [him] on account of" his sex and age. *Id.* Answering that question, the Court concludes that no reasonable jury could infer from the Department's failure to reprimand Whittle that its stated reason for reprimanding Thompson was pretextual and that the Department was actually motivated by discriminatory animus.

      b.      <u>Past Performance and Appropriateness of Punishment</u>

Thompson also argues that a reasonable jury could find that the Department's proffered reason for reprimanding him was pretextual because he had "a history of good performance,"

had "no prior disciplinary record," and had "received merit awards" in the past. Dkt. 19 at 28 (internal quotation marks and alterations omitted). Similarly, he asserts that the Department's decision to restrict him from trial work was inappropriate in light of "other, much less severe options" available, like permitting Thompson to "work[] alone" on trial-related assignments. *Id.* at 22–23.

Neither argument has merit. First, the Department did not determine that Thompson was incompetent, that his work product failed to meet expectations, or that he was not a talented trial attorney; it concluded that he was abusive to his colleagues and that it was necessary to impress upon him that his behavior had to change. Second, Thompson's "own personal opinion" about the appropriateness of the Department's decision to relieve him from trial work is "inadequate by itself to create an issue for the jury," *Walker*, 798 F.3d at 1094. To the contrary, it is the Department's "perception" of an appropriate consequence "that is relevant," *Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011), and, there is no reason to doubt that the Department believed that Thompson's conduct warranted relieving him from all trial work. As the EDS Deputy Section Chief explained, "several factors support[ed] that decision":

> First, the section's trial work often involves a large amount of travel. Because of . . . Thompson's behavior, [EDS] wanted to shift him to in-office assignments so that [it] could more closely supervise his conduct. Second, [EDS] typically assign[s] teams of lawyers to handle cases going to trial. Because of . . . Thompson's abusive treatment towards junior members of his trial teams, [EDS] wanted to reassign him to projects that could be handled solo. Third, it seemed to [EDS] that . . . Thompson's explosive outbursts of temper had gotten more frequent as trial dates approached (and stress levels increased correspondingly), and [EDS] wanted in part to address his anger management problem by removing upcoming trials as a source of stress in his work assignments.

Dkt. 20-23 at 5. It is not for the Court to "second-guess" that "personnel decision absent demonstrably discriminatory motive." *Wheeler*, 812 F.3d at 1114 (citation omitted). Thompson may personally believe that the Department's decision to relieve him of trial responsibility was

unnecessary, but that subjective assessment, without more, would not allow a reasonable jury to find that the Department's differing view was a pretext for discrimination. *See Dyer v. McCormick & Schmick's Seafood Rests., Inc*, --- F. Supp. 3d ---, No. 14-1037, 2017 WL 3868423, at *15 (D.D.C. Sept. 3, 2017).

      c.    <u>Compliance With Law</u>

Finally, Thompson claims that the Department's decision to relieve him of trial responsibilities was "a violation of law," Dkt. 19 at 22, because he was not given an "opportunity to amend [his] performance" prior to receiving a humiliating demotion," Dkt. 24 at 16. Specifically, Thompson asserts that the Department violated 5 U.S.C. § 4302, which directs the Office of Personnel Management ("OPM") to set standards for agencies' "performance appraisal systems," including one that states that "reassigning" an employee "who continue[s] to have unacceptable performance" may occur "only after an opportunity to demonstrate acceptable performance." *Id.* § 4302(b)(6).

As an initial matter, it is unclear what, if any, rule was violated. Thompson cites to an August 2009 letter produced as part of an EEO investigation with an attachment describing an ENRD "Performance Appraisal Program." Dkt. 19-1 at 214–33. That attachment, however, states that "[f]or attorneys, procedural rights in a performance-based action[] will be provided in accordance with policy issued by the Office of Attorney Recruitment and Management and applicable regulations," Dkt. 19-1 at 231, and Thompson fails to point to any such policy or to explain whether or how it might apply. More importantly, there is no reason to conclude that his reprimand was issued as part of the performance appraisal process, and it is well-settled that § 4302 procedures do not establish the *exclusive* procedures for taking actions against federal employees who engage in misconduct. *See United States v. Fausto*, 484 U.S. 439, 446–47

(1988) (describing 5 U.S.C. § 7501 et seq. as "govern[ing] adverse action taken against employees for the 'efficiency of the service,' which includes action . . . based on misconduct"); *Lovshin v. Dep't of Navy*, 767 F.2d 826, 843 (Fed. Cir. 1985) (observing "the continued viability of removal 'for cause' under Chapter 75 for performance-based reasons" even after the introduction of § 4302); Dep't of Justice Order No. 1200.1, Part 3, Ch. 3-1 (Aug. 25, 1998) (providing for Department of Justice disciplinary proceedings under 5 U.S.C. § 7501 et seq.).

Even if the Court were to presume the existence of such an opportunity-to-improve rule, moreover, Thompson has failed to explain how such a possible violation of a civil service rule supports his Title VII and ADEA claims. To be sure, "an unexplained *inconsistency*" in an employer's decision-making with respect to an employee "can justify an inference of discriminatory motive." *Lathram v. Snow*, 336 F.3d 1085, 1093 (D.C. Cir. 2003) (emphasis added); *see also Brady*, 520 F.3d at 495 n.3 (noting that "[e]mployees often try to cast doubt on an employer's asserted reason" by, among other things, "pointing to . . . the employer's failure to follow *established* procedures or criteria" (emphasis added)). Thus, if there was evidence that Thompson's supervisors had placed another, similarly situated employee on an improvement plan, without any immediate repercussions, or if there was evidence that they knowingly disregarded procedures that they applied in other cases, that evidence might carry some weight with respect to Thompson's discrimination claims. It proves too much, however, to suggest that any arguable violation of the civil service rules that the employee might identify after the fact is sufficient to establish a triable issue of fact on a discrimination claim. Because Thompson offers no evidence linking his contention that EDS failed to provide him with an opportunity to mend his ways to his allegation that he was the victim of sex or age discrimination, that contention— standing alone—would not permit a reasonable jury to conclude that the Department's stated

rationale for the reprimand was pretextual and that, in fact, it issued the reprimand because of Thompson's sex or age. *See Risher v. Aldridge*, 889 F.2d 592, 597 (5th Cir. 1989); *Alford v. Defense Intelligence Agency*, 908 F. Supp. 2d 164, 175 (D.D.C. 2012).

The Court will, therefore, grant summary judgment to the Department as to those portions of Thompson's Title VII and ADEA claims.

2.      *Awards*

Thompson also alleges that the Department discriminated against him by "unjustifiably . . . den[ying] [him] two special recognition awards for work achievement" that he asserts he had earned for his participation on two successful EDS trial teams. Dkt. 7 at 4–5 (Am. Compl. ¶ 10(c)). Although the parties dispute whether Thompson was entitled to receive the awards, *see, e.g.*, Dkt. 19 at 18–20; Dkt. 20 at 14–16, the Court need not enter that thicket. Before reaching that question, the Court must first consider whether denial of the awards constituted an "adverse employment action," *Brady*, 520 F.3d at 493, and, as explained below, the Court concludes that Thompson's contention that he was denied the two recognition awards in violation of Title VII and the ADEA fails to clear this initial hurdle.

"[N]ot everything that makes an employee unhappy is . . . actionable" under federal discrimination laws. *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001); *see also Nurriddin*, 818 F.3d at 762 ("Our employment discrimination laws are meant to protect against more than just decisions an employee believes to be unfair."). Rather, employment discrimination under Title VII and the ADEA requires an "*adverse* employment action," which means a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009) (citation omitted) (emphasis added).

To suffer an adverse action, the employee must "experience[] materially adverse consequences affecting the terms, conditions, or privileges of employment . . . such that a reasonable trier of fact could find objectively tangible harm." *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002).

Thompson asserts that he "is not seeking monetary awards, but is seeking non-monetary awards." Dkt. 19 at 19. Moreover, he does not identify any other tangible consequence resulting from the Department's decision not to recognize his contributions to the two successful trial teams. He does not contend, for example, that his failure to receive either award affected his eligibility for any bonus or that, had he received one or both of the awards, he likely would have qualified for a promotion or some other advancement. Instead, he simply asserts that he was "slighted," Dkt. 19 at 18; *see id.* at 27, and that the denial of *two* awards was "doubly hurtful and doubly insulting," *id.* at 32. The Court does not doubt the sincerity with which Thompson believes he was entitled to these awards, but not every slight in the employment setting implicates Title VII and the ADEA. Although denials of monetary performance awards or bonuses typically meet the adverse action standard, *see Bridgeforth v. Jewell*, 721 F.3d 661, 664 (D.C. Cir. 2013); *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 762 (1998) ("A tangible employment action in most cases inflicts direct economic harm."), denials of non-monetary awards—standing alone—do not, *see Saba v. U.S. Dep't of Agric.*, 26 F. Supp. 3d 16, 25 (D.D.C. 2014). Accordingly, because Thompson does not seek any monetary awards, and because he has failed to identify any other "objectively tangible harm" he sustained by virtue of the Department's award decisions, he cannot satisfy the "adverse employment action" requirement.

In response, Thompson contends that "the 'adverse action' standard is inapplicable in discrimination suits . . . against the federal government." Dkt. 29 at 7. That is incorrect. It is settled law that the adverse action requirement applies to suits against federal agencies, just as it applies to suits against private employers. *See, e.g.*, *Chambers v. Burwell*, 824 F.3d 141, 143 (D.C. Cir. 2016) (applying adverse action requirement in suit against the Department of Health and Human Services); *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008) (applying adverse action requirement in suit against Department of the Interior).

The Court will, therefore, grant summary judgment to the Department as to this portion of Thompson's Title VII and ADEA claims.

3.    *Constructive Discharge*

Thompson's final discrimination claim asserts that he was constructively discharged when Grishaw "reliev[ed] [him] of all trial work," Dkt. 20-25 at 4 (reprimand letter), and then Edgar instructed him to perform a trial-related assignment. Dkt. 7 at 5 (Am. Compl. ¶ 10(d)). This assignment, Thompson asserts, "presented [him] with a Hobson's choice": he could either "disobey his first-line supervisor at the danger of an insubordination charge for failure to perform the assigned task" or he could "disobey his second-line supervisor at the danger of a charge of failure to follow the no-trial[-]work instructions." Dkt. 19 at 24. Faced with this "damned if he did, damned if he didn't" situation, Thompson concluded that early retirement was "the only way [he] could . . . extricate himself from the situation," and he argues that, as a result, he was constructively discharged. *Id.*

To prove a constructive discharge claim, Thompson would need to convince a reasonable jury "that (1) intentional discrimination existed, (2) the [Department] deliberately made working conditions intolerable, and (3) aggravating factors justified [his] conclusion that []he had no

option but to end h[is] employment." *Carter v. George Wash. Univ.*, 180 F. Supp. 2d 97, 110 (D.D.C. 2001) (citing *Clark v. Marsh,* 665 F.2d 1168, 1173–74 (D.C. Cir. 1981)).  For present purposes, however, one question is dispositive: has Thompson identified evidence that would permit a reasonable jury to find that EDS management effectively forced him to leave by creating "working conditions" that were "so intolerable that a reasonable person in [his] position would have felt compelled to resign?"  *Pa. State Police v. Suders,* 542 U.S. 129, 141 (2004); *see also Steele v. Schafer*, 535 F.3d 689, 695 (D.C. Cir. 2008) ("[T]o establish constructive discharge, the plaintiff . . . must show that the abusive working environment become so intolerable that her resignation qualified as a fitting response." (internal quotation marks and citation omitted)).  As explained below, the answer to that question is "no" and, thus, Thompson's constructive discharge claim necessarily fails.

The essential facts are undisputed.  To start, all agree that Grishaw relieved Thompson "of all trial work" and that she reassigned him to "work on other matters" as "an Attorney-Advisor."  Dkt. 20-25 at 4.  Shortly thereafter, Edgar assigned Thompson "to assist the Navy, Army, DMRS and Coast Guard in responding to demand letters from the New Jersey Department of Environmental Protection for payment of response costs in connection with" a site in New Jersey.  Dkt. 20-26 at 3 (Edgar Decl. ¶ 10).  As she later explained, she "anticipated that . . . Thompson would investigate" the matter and, "if appropriate, attempt to negotiate a settlement without litigation being filed."  *Id*. (Edgar Decl. ¶ 10).  After receiving the assignment, however, Thompson expressed concern about the limitation imposed by Grishaw, and he "reminded [Edgar] that he was prohibited from trial work."  *Id.* (Edgar Decl. ¶ 11).  In response, Edgar confirmed that she "was aware of that" limitation, and she told him "not to worry about it."  *Id.* (Edgar Decl. ¶ 11).

Thompson, for his part, does not dispute that he was told by his first-line supervisor "not to worry about" the assignment, *see* Dkt. 20-3 at 42 (Thompson Dep. 110:7–14); he simply disagrees that Edgar meant what she told him, *see* Dkt. 24 at 17 ("[T]here *was* something to 'worry about,' i.e., the threat of an insubordination charge and/or the threat of firing . . . ." (emphasis added)). He further admits that, even though Edgar's response "puzzled [him] to no end," Dkt. 20-3 at 42 (Thompson Dep. 110:13–14), he did not seek further clarification from Edgar, Grishaw, or any other supervisor, *id.* at 43 (Thompson Dep. 111:7–24); Dkt. 24-2 at 46 (Thompson Dep. 281:9–15), but, instead, decided that early retirement was "the only way" to "extricate himself from the situation," Dkt. 19 at 24.

That sequence of events does not represent the sort of "intolerable" working conditions that could give rise to a constructive discharge claim. Thompson is correct that Edgar, who was "engaged in another task" at the moment Thompson raised the issue, did not further explain that she had cleared the assignment with Grishaw for compliance with the reprimand letter. Dkt. 20-26 at 3 (Edgar Decl. ¶ 11). But Thompson admits that over the course of the five days between when he was given the assignment and when he announced his retirement, he made no attempt to speak with any supervisor about whether he could work on the assignment without running afoul of his reprimand. When pressed as to why he had failed to take that logical step, Thompson asserted that it was his "view" that if he "ask[ed] any more questions, [his supervisors were] going to slam [him]," Dkt. 24-2 at 47 (Thompson Dep. 283:9–13), and he admitted that he was "paranoi[d] . . . that [he] was being set up to be further disciplined," Dkt. 20-2 at 23 (Thompson Aff. 22). Thompson might rationally have accepted his supervisor's assurance that it was okay for him to work on the assignment, but, even if he did remain "puzzled," no reasonable jury

could find that he had been placed in an "intolerable" situation that compelled him to resign—without taking even the most rudimentary steps to resolve the dilemma that he believed he faced.

Finally, Thompson argues that it was the Department's "internally stated 'goal' from April 14, 2008[,] onward" to "obtain a retirement date from [him]." Dkt. 19 at 30. He is correct that there is evidence in the record from which a reasonable jury could find (1) that his supervisors repeatedly sought to get him to specify the date on which he intended to retire, s*ee, e.g.*, Dkt. 19-1 at 118; Dkt. 20-16 at 2; (2) that at least Bruffy and Grishaw hoped he would retire, *see, e.g.*, Dkt. 19-1 at 156 (Bruffy responding, "[o]h damn" to a report that Thompson would be returning to work from his sick leave, and Grishaw answering, "[m]y sentiments precisely"); *id.* at 159 (Bruffy advising Grishaw before she delivered the reprimand that, "if [Thompson] asks if you are trying to get rid of him," she should "say that you think it would have been better for everyone if he had retired, but that your focus now is on allowing him to contribute to the office without so much drama"); and (3) that the investigation into the April 2 incident was motivated, at least in part, by a desire to encourage Thompson to follow through on his stated intention to retire, *see* Dkt. 19-2 at 301 (Bruffy April 22 email stating that the Department "should start the investigation, if only to keep the pressure on for him to leave").

Thompson does not, however, identify any evidence from which a reasonable jury could find that the Department's actions were pretextual and that the real reason for those actions was discrimination on the basis of his sex and age. What the uncontested evidence does show is that the Department's efforts to confirm a retirement date with Thompson followed his repeated statements that he intended to "[r]etire at some point," Dkt. 20-10 at 2, and were prompted by his supervisors' concerns that an impending hiring freeze would prevent them from filling his position if they did not receive a definitive decision in a timely fashion, Dkt. 20-16 at 2.

Moreover, in their conversations with Thompson while he was on sick leave, Department employees repeatedly emphasized that it was his choice when to retire and that they were "not trying to pressure [him] to make a decision one way or another." *Id.*; *see also* Dkt. 20-13 at 2 (Rogers July 1 email stating that it was "totally [Thompson's] decision" how the Department was to treat his office during his leave). Similarly, to the extent the evidence indicates that Thompson's supervisors hoped that he would retire and that the investigation was designed, at least in part, to push him toward a decision to do so, that same evidence shows that their concern was a product of Thompson's abusive behavior; for the reasons explained above, *see supra* Part III.A.1, there is no evidence that would permit a reasonable jury to find that their desire for him to retire was based on his sex or age.

The Court will, therefore, grant summary judgment to the Department as to Thompson's constructive discharge claims under Title VII and the ADEA.

**B.      Due Process Claim**

Thompson also alleges that the Department's "interrogation, investigation, reprimand, and grievance procedures were biased and unfair, in violation of the Due Process Clause of the Fifth Amendment." Dkt. 7 at 7 (Am. Compl. ¶ 18). Specifically, he asserts that the "kangaroo-court-like interrogation and investigation were devoid of due process" because they "proceeded without prior notice and without written specification of the charges." Dkt. 19 at 29. In addition, Thompson contends that the Department "violated its own grievance procedure" because Bruffy, "one of the individuals against whom" Thompson filed his grievance, "covertly

selected the grievance reviewer" and, ultimately, "covertly wrote the grievance opinion" that absolved Bruffy and the Department of any fault. *Id.* at 37.

At oral argument, Thompson clarified that he does not seek "money damages" on this claim. Oral Arg. Tr. (Rough at 19). Instead, as he explained, he seeks a mandatory injunction requiring "reform[] of the interrogation, investigation, reprimand, and grievance procedures of the Justice Department or, at least, the [ENRD]." *Id.* (Rough at 18); *see also* Dkt. 7 at 7 (Am. Compl. Request for Relief) ("Plaintiff prays this Court to . . . order the [Department] to reform its interrogation, investigation, reprimand, and grievance procedures to comport with due process and other law."); Dkt. 19 at 1 ("Plaintiff seeks . . . injunctive relief for due process . . . violations."). In light of this clarification, the Court inquired whether Thompson "ha[d] standing to raise" a due process claim if he was "not going to be subject to [the complained-of] process ever again in the future." Oral Arg. Tr. (Rough at 18). To ensure that the parties had an adequate opportunity to address this threshold question, the Court granted the parties leave to file "additional briefs addressing" the issue, *see* Minute Entry (Aug. 1, 2017), which they have done, Dkt. 28; Dkt. 29. For the reasons explained below, the Court now concludes that it lacks Article III jurisdiction to consider Thompson's due process claim.

"Article III of the Constitution limits the jurisdiction of federal courts to 'actual cases or controversies between proper litigants.'" *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014) (quoting *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 661 (D.C. Cir. 1996) (en banc)). Among other things, this means that the Court lacks power to adjudicate Thompson's due process claim unless he has standing to assert that specific claim. *See West v. Lynch*, 845 F.3d 1228, 1235 (D.C. Cir. 2017) (explaining that, because "'standing is not dispensed in gross' but instead may differ claim by claim," a plaintiff must demonstrate his "standing to pursue" each of

his claims) (quoting *Davis v. FEC*, 554 U.S. 724, 734 (2008)).  Because Thompson seeks only prospective injunctive relief, and because the case is currently before the Court on summary judgment, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (plaintiff's burden of establishing standing varies with the stage of the proceeding), he bears the burden of offering evidence "that he . . . 'is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct.'  *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983); *see also Williams v. Lew*, 819 F.3d 466, 472 (D.C. Cir. 2016) ("[W]here a plaintiff 'seeks prospective . . . injunctive relief, he must establish an ongoing or future injury that is '*certainly impending*;' he may not rest on past injury.'" (quoting *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (emphasis added)).

Thompson has failed to meet that standard.  He has not identified any evidence in the record suggesting that he has sought reemployment with the Department, that he has any intention to do so in the future, or that he will ever be subject to the Department's investigation, reprimand, or grievance procedures again.  "Absent a sufficient likelihood that he will again be wronged in a similar way," Thompson is "no more entitled to an injunction" or declaratory judgment than anyone else, and "a federal court may not entertain a claim by any or all citizens who no more than assert that certain" agency action—or inaction—is unlawful.  *Lyons*, 461 U.S. at 111 (1983).

Accordingly, because the Court concludes that Thompson lacks standing to pursue the injunctive relief he seeks, it will dismiss his due process claim.

## C.    FOIA "Policy or Practice" Claim

In 2015, Thompson submitted a series of FOIA requests to the Department seeking, among other things, records related to EDS's "employee rosters," "written policies" about

performance awards, and investigative reports compiled in response to the April 2 incident. *See, e.g.*, Dkt. 20-32 at 4–5; Dkt. 20-33 at 6–8. The Department eventually produced a number of responsive records. *See* Dkt. 20-32 at 18–19, 26–27; Dkt. 20-33 at 12–13. It does not dispute, however, that it failed to comply with the relevant time limit set forth in FOIA, which requires (except in unusual circumstances) that an agency "determine within 20 days . . . after receipt of [a request for records] whether to comply with such request" and that it "immediately notify the person making such a request of such determination and the reasons therefor." 5 U.S.C. § 552(a)(6)(A)(i); *see also Citizens for Responsibility and Ethics in Washington v. FEC*, 711 F.3d 180, 182–83 (D.C. Cir. 2013); Dkt. 20 at 39–45.

Thompson alleges that the "Department has a history of tardy disclosures in response to requests under" FOIA and that the "Department['s] FOIA regulations almost guarantee illegally late responses." Dkt. 7 at 6 (Am. Compl. ¶ 14). He further alleges that, in 2008, almost a quarter of all FOIA responses from the federal government were late and that he did not receive timely responses to FOIA requests that he submitted to the Department in 2015. *Id.* (Am. Compl. ¶ 14). Based on these allegations, he asserts that the Department's "FOIA procedures were recalcitrant and in bad faith," and he requests that the Court order that the "Department in the future to comply with the requirements of FOIA." *Id.* at 7 (Am. Compl. ¶ 18 & Request for Relief).

Much of the Department's response is directed at the adequacy—as opposed to the timeliness—of its response to Thompson's various FOIA requests. *See, e.g.*, Dkt. 20 at 39–45. At oral argument, however, Thompson clarified that the "only thing" he asked for in his claim for relief was an "injunction" that would require the Department to respond to future FOIA requests in a timely manner. Oral Arg. Tr. (Rough at 26). It thus appears that Thompson intends to pursue a "policy or practice" claim, which requires that the plaintiff demonstrate that "the

agency has adopted, endorsed, or implemented some policy or practice that constitutes an ongoing 'failure to abide by the terms of . . . FOIA.'" *Muttitt v. Dep't of State*, 926 F. Supp. 2d 284, 293 (D.D.C. 2013) (quoting *Payne Enters., Inc. v. United States*, 837 F.2d 486, 491 (D.C. Cir. 1988)). For present purposes, what is most significant is that a "policy or practice" claim focuses on whether "agency policy or practice will impair the party's lawful access to information *in the future*." *Newport Aeronautical Sales v. Dep't of Air Force*, 684 F.3d 160, 164 (D.C. Cir. 2012) (quoting *Payne*, 837 F.2d at 491) (emphasis added). Given this understanding of Thompson's FOIA claim, the Court must once again confront the question of standing.

The answer to the standing question is less clear cut in this context than it was with respect to Thompson's due process claim. There, it was evident that Thompson was *unlikely* to face any future Department of Justice disciplinary proceeding. Here, in contrast, Thompson represented at oral argument that he "might" submit future FOIA requests to the Department, and he listed certain records that he would like to obtain. Oral Arg. Tr. (Rough at 26–29). His representations at oral argument, however, did not constitute evidence, nor were they sufficiently clear to permit the Court to determine whether Thompson, in fact, faced the type of "certainly impending" future injury that would support a finding that he had standing when he filed this action. *Arpaio*, 797 F.3d at 19. But, at the same time, the Department has failed to offer evidence that would permit the Court to conclude that there is no material dispute of fact with respect Thompson's intentions at the time of filing. Indeed, much of the Department's briefing to date focuses on whether its responses to Thompson's past FOIA requests were adequate. Under these circumstances, the Court cannot resolve the threshold question of standing, and, without deciding that issue, it cannot reach of the merits of Thompson's "policy and practice" claim.

The Court will, accordingly, deny both cross-motions for summary judgment on the ground that Thompson has not shown that he has standing to pursue a "policy or practice" FOIA claim, while the Department has yet to negate (or even to address) that prospect.

## CONCLUSION

For the reasons explained above, Thompson's motion for summary judgment, Dkt. 18; Dkt. 19, is hereby **DENIED**, and the Department's motion for summary judgment, Dkt. 20, is hereby **GRANTED** in part and **DENIED** in part. Thompson's due process claim is hereby **DISMISSED** for lack of jurisdiction.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: October 3, 2017